**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**PATRICK CARSON,**

      **Petitioner,**

**vs.**

                                     **Case No. 4:07cv477-SPM/WCS**

**WALTER A. McNEIL,**

      **Respondent.**

_____/


**<u>REPORT AND RECOMMENDATION ON § 2254 PETITION</u>**

      This cause is before the court for ruling on a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  Doc. 1.  Respondent filed an answer and the record in paper form, doc. 8, and Petitioner filed a reply, doc. 10.  Respondent concedes that the petition is timely and state court remedies have been exhausted.  Doc. 8, p. 2.

      Petitioner challenges the judgment and twenty year sentence imposed by the Circuit Court of the Third Judicial Circuit, in and for Taylor County, Florida, case number 2000-263-CF.  He was convicted pursuant to a guilty plea of attempted armed robbery with a firearm, aggravated assault with discharge of a firearm, and escape.  References to exhibits are to those submitted with the answer unless otherwise indicated.

**Procedural history**

Petitioner was charged with attempted armed robbery (of a purse from Wilma Gallaher) with discharge of a firearm, and aggravated assault (against Patrick Gallaher) with discharge of a firearm, each charge carrying a 20 year minimum mandatory.  Ex. A, pp. 26-27 (information of November 6, 2000).  The offenses were committed on or about July 19, 2000.  Petitioner was later charged with escape from a work release program.  *Id.*, pp. 28-29; Ex. E (initial brief of appellant), pp. 2-3 (noting that the escape charge was severed but the eventual plea was to all three charges).

The history of the case prior to the plea is complicated, and discussed here only as relevant to the § 2254 issues.  *See* Ex. E, pp. 2-9 (statement of the case).  Petitioner was sentenced on April 6, 2005, to a total of twenty years (a twenty year minimum on count one, five years on count two, and fifteen years on count three, the escape, to be served concurrently).  Ex. B, pp. 367-376.

Petitioner argued on direct appeal that the trial court erred in failing to appoint conflict free counsel to represent him during the plea hearing, and on his motion to withdraw plea.  Ex. E.  The judgment was affirmed without opinion.  Ex. H.  He filed a Fla.R.Crim.P. 3.850 motion raising the claims now before this court, which was denied as discussed ahead.  The denial was affirmed on appeal.

**Section 2254 Standard of Review**

For claims that were properly exhausted and adjudicated in state court, this court's review is limited.  "[A] determination of a factual issue made by a State court shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1);

Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted).

This applies to factual findings by both the trial and appellate courts.  Dill v. Allen, 488

F.3d 1344, 1354 (11th Cir. 2007) (citing Bui).

> [A] federal court may not issue a writ of habeas corpus setting aside a
> state court's denial of a federal constitutional claim unless the petitioner
> demonstrates that the state court's decision is flawed for one or both of
> the reasons listed in 28 U.S.C. § 2254(d).  The first reason is that the state
> court misapplied the relevant holdings of the United States Supreme
> Court; the second reason is that the state court's findings of fact lack
> evidentiary support.  In assessing the state court's findings of fact, we
> "presume" those findings are "correct."  *See id.*; 28 U.S.C. § 2254(e)(1).  If
> the petitioner contends that the findings of fact are not correct, he bears
> the burden of establishing that they are not correct by "clear and
> convincing evidence."  *Id.* ("The [petitioner] shall have the burden of
> rebutting the presumption of correctness by clear and convincing
> evidence.").

Pace v. McNeil, __ F.3d __, 2009 WL 242362, *11 (11th Cir. February 3, 2009) (citation

and footnotes omitted).  *See* § 2254(d) (§ 2254 relief will not be granted on a claim

adjudicated in state court unless adjudication "(1) resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States; or (2) resulted in a decision

that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding.");  Williams v. Taylor, 529 U.S. 362, 404-406,

120 S.Ct. 1495, 1519-1520, 146  L.Ed.2d 389 (2000) (discussing the different meanings

of the "contrary to" and "unreasonable application" clauses of § 2254(d)(1)).

The basic law governing ineffective assistance of counsel claims was clearly

established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066,

2068, 80 L.Ed.2d 674 (1984); Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520.

Ineffective assistance of counsel is a two part inquiry.  "A convicted defendant making a

claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," and must also "affirmatively prove prejudice."  Strickland, 466 U.S. at 690, 693-694, 104 S.Ct. at 2066-68.  The court need not approach the Strickland inquiry in any particular order, or address both prongs if an insufficient showing is made on one.  466 U.S. at 697, 104 S.Ct. at 2069.  A petitioner "bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a *Strickland* claim, and both prongs must be proved to prevail."  Johnson v. Alabama, 256 F.3d 1156, 1176 (11th Cir. 2001), *cert. denied*, 535 U.S. 926 (2002).  The cases which prevail under Strickland "are few and far between."  *Id.* (citation omitted).

To show prejudice where ineffective assistance of counsel is alleged in the context of a guilty plea, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 467 U.S. 52, 59, 106 S.Ct 366, 370, 88 L.Ed.2d 203 (1985) (footnote omitted).

**Ground One**

Petitioner claims that counsel was ineffective for failing to investigate and file motions to suppress evidence of the attempted robbery and assault.  Doc. 1, pp. 5-9. He alleges that on the morning of July 19, 2000, his brother drove him to the hospital for treatment of a finger wound.  *Id.*, p. 5.  Officer Jimmy Parker came to talk to him, and Petitioner told him he injured his finger burning trash in his mother's yard.  *Id.*  Parker told him there had been a robbery around 12:30 a.m. at a local motel, but Petitioner denied involvement.  *Id.*  Parker took a photo of Petitioner and then left the hospital.  *Id.*

Parker returned some 45 minutes later and advised Petitioner that the victims identified

him and Petitioner would have to go to the police station.  *Id.*  Petitioner said he

objected because he was to be sent to an orthopedic center in Tallahassee for further

treatment; Parker told him he had no choice and escorted Petitioner to his police car.

*Id.*, pp. 5-6.

Petitioner alleges that at the police station, Detective Clay Parker questioned him

without advising him of his rights.  *Id.*, p. 6.  Petitioner denied involvement and Detective

Parker asked for a mouth swab for DNA.  *Id.*  Petitioner said he asked why, and the

detective told him, "the victims have already identified you, and the only way your black

ass won't go to jail today is if you give me a mouth swab."  *Id.*  The swab was taken and

Petitioner allowed to leave, and he proceeded to the orthopedic center for further

treatment.  *Id.*  Petitioner was arrested months later, on November 2, 2000.  *Id.*

Petitioner claims that on September 19, 2001, it was discovered that the victims

had *not* identified him, but had identified two other people, and that Clay Parker showed

them the single photo of Petitioner and told them "this is the guy!"  *Id.*, p. 7.  Petitioner

asserts that Clay Parker later destroyed the photos of the two suspects identified by the

victims.  *Id.*

Petitioner argues that Jimmy Parker did not have probable cause to seize him at

the hospital and transport him to the police station to allow Clay Parker to take a DNA

sample.  *Id.*  He asserts that "the officers created a false probable cause by showing the

victims a single photo of Carson, telling them, 'this is the guy!' and then lied to Carson,

telling him, the victims have identified you."  *Id.*  Petitioner asserts that counsel Fred

Castleman "had this information in his hands, but failed to read and investigate the

depositions, perpetuated testimony, and video tape of the witnesses in the case, to prepare a motion to suppress any in court identification on the improper suggestive identification, 'and', a motion to suppress the illegally seized D.N.A. samples with the laboratory results." *Id.*, p. 8. Petitioner claims that without this evidence, a motion for judgment of acquittal would have been granted. *Id.* Petitioner asserts that counsel "repeatedly pushed" him to plead guilty and did not advise him of the suppression issue. *Id.*

Petitioner made this argument by Fla.R.Crim.P. 3.850 motion. Ex. I, pp. 10-18.[1] Then, as now, Petitioner claimed that he was told he had to go to the police station because he was identified by the victims. *Id.*, p. 11. He claimed the discovery, during depositions on September 19, 2001, that two others had actually been identified, but the victims were shown a picture of him and told "this is the guy." *Id.*, pp. 12-17 (quoting excerpts from depositions). He claimed that officers "had no evidence to create probable cause and only had a suspicion. So they lied to create a false probable cause to obtain the D.N.A. evidence they wanted." *Id.*, p. 17. He asserted that the police illegally seized his DNA following the illegal detention, and counsel should have sought suppression of the DNA taken as a result of illegal detention. *Id.* He also claimed counsel should have sought to suppress any in court identification due to improperly suggestive actions of the officers. *Id.*, p. 18.

The trial court denied the Rule 3.850 motion without a hearing. The court found:

---

[1] Ex. I is the full record on appeal on the Rule 3.850 proceeding. References to pages in that exhibit are to the pages of the record on the bottom right of each page rather than the page of a particular document within the record.

With regards to the DNA evidence obtained from the Defendant, this Court finds that Defendant voluntarily allowed the police to conduct a mouth swab.  Contained within the record are three police reports from two separate officers each indicating that the Defendant voluntarily agreed to come to the Perry Police Department for questioning.  After being fully informed of his constitutional rights, the Defendant, upon request, voluntarily agreed to provide a DNA sample.  Defendant was informed that such samples would be compared to the evidence found at the scene.  As the now contested DNA samples were given voluntarily, Trial  Counsel would not have had a valid basis to file a motion to suppress and did not render ineffective assistance by failing to file a baseless motion.

With regards to the motion to suppress the identification by Patrick and Wilma Gallaher, this Court finds Trial Counsel did submit an informal motion to suppress the identification testimony as being tainted by the inappropriate actions of law enforcement.  Prior to the start of the depositions of Wilma Patrick Gallaher on October 16, 2001, Trial Counsel explained that he had discussed the possibility of filing a motion to suppress the identification testimony of both the Gallahers with the judge and prosecution but due to the terrorist attacks of September 11th and Trial Counsel's involvement with the Marine Reserves, he had not had the opportunity to prepare a formal motion.  Despite the fact that a formal motion had not been prepared, Trial Counsel renewed his objection to the proposed identification testimony on the record during depositions.  While no formal motion was actually filed, the need to do so became moot [when] the Defendant entered a plea of guilty. . . .

Further, it is clear from the record that the cusp of the State's case against the Defendant was the DNA match to evidence found at the scene.  Thus, this Court fails to see how Trial Counsel's alleged failure to file a motion to suppress an arguably unreliable identification affected the Defendant's decision not to go to trial. . . .   Considering the fact that the Defendant's DNA was matched to DNA found at the scene, the relatively short time frame between [the] alleged robber being shot and the Defendant arriving at the emergency room with a gun shot wound and the fact that the prosecution was prepared to scientifically disprove the Defendant's explanation for the gun shot wound, it is very unlikely that the Defendant's decision to plead guilty would have changed had the Gallaher's identification been suppressed.

Ex. J, pp. 3-4 (order signed on April 26 and sent on April 30, 2007).[2]

---

[2]   The order with the exhibits (as attached in support by the court) was submitted in the supplemental record on appeal, Ex. J, pp. 1-30.  References to Ex. J are to the

The amended order addressed the suppression of DNA and suppression of identification as two separate and unrelated claims.  An order signed December 8, 2006, addressed the claim somewhat differently, finding there was probable cause to obtain a DNA sample so a motion to suppress would have been denied.  Ex. I, pp. 90-94 (citation omitted).[3]  That order was superseded, however, by Judge Koberlein's order of April 26, 2007.[4]

The amended order did not address the claim perceived by this court, that Petitioner's consent was involuntary because the officers tricked or coerced Petitioner into providing a DNA sample by falsely claiming that the victims identified him, and by saying he would not be released until he provided a sample.  *Cf*. Schneckloth v. Bustamonte, 412 U.S. 218, 221-235, 93 S.Ct. 2041, 2045-51, 36 L.Ed.2d 854 (1973) (consent to search must be voluntary, rather than the product of duress or coercion,

---

record number at the bottom left of each page.  The order (without exhibits) also appears in Ex. I at pp. 129-135; that copy bears a clerk's file stamp of May 3, 2007.

[3] The court said, "[a]ccording to the court file and records, once the police had been informed that the crime had taken place, and discovered that a shot had been fired and struck the assailant, a BOLO was put out to the hospitals for anyone coming in with a gunshot wound.  The police were soon notified that the Defendant had appeared at the hospital with a gunshot wound, and upon questioning, volunteered a DNS [sic] swab sample. . . .  As the Defendant matched the general description, appeared at a hospital with a gunshot wound of dubious explanation, the police had probable cause to obtain a DNA sample and a motion to suppress would not have been granted.  Therefore, the Defendant's counsel cannot be said to have been ineffective for failing to raise a claim that has no merit."  Ex. I, pp. 91-92.  A full copy of the order also appears in Ex. I at pp. 184-188.

[4] The December 8 order, signed by Judge Davis (who was no longer with the state effective January 1, 2007), had "addressed each ground and denied each on their individual merits, [but] the final paragraph inadvertently stated that only Ground 2 was denied," prompting Petitioner to seek rehearing; so the court reconsidered the initial motion "in order to resolve any confusion."  Ex. J, pp. 1-2 and n. 1 (amended order).

express or implied; voluntariness of consent is determined from totality of the circumstances); Moran v. Burbine, 475 U.S. 412, 424, 106 S.Ct. 1135, 1142, 89 L.Ed.2d 410 (1986) (failing to inform defendant that his attorney tried to call was not the kind of "trickery" which could "vitiate the validity of a waiver.") (citations omitted).  Since the state court did not address this claim, the court therefore reviews it without the deference otherwise mandated by § 2254(d).

Even so, a Fourth Amendment violation "does not necessarily mean that the exclusionary rule applies."  Herring v. United States, 555 U.S. __, 129 S.Ct. 695, 700 (January 14, 2009).  The exclusion of evidence is a "last resort," and applies only where application would deter future Fourth Amendment violations.  Id., at 700-701 (citations omitted).  Further, since the claim is that counsel was ineffective for failing to file a motion to suppress, Petitioner must prove "(1) that counsel's representation fell below an objective standard of reasonableness, (2) that the Fourth Amendment claim is meritorious, and (3) that there is a reasonable probability that the verdict would have been different absent the excludable evidence," or – since Petitioner pleaded guilty – that he would not have entered a plea.  Zakrzewski v. McDonough, 455 F.3d 1254, 1260 (11th Cir. 2006), citing Kimmelman v. Morrison, 477 U.S. 365, 375, 106 S.Ct. 2574, 2582-83, 91 L.Ed.2d 305 (1986).  As set forth ahead, Petitioner cannot demonstrate a meritorious Fourth Amendment claim.

Attached to the amended order in support are police reports of Jim Wiggins (not Jimmy Parker) and Cla (not Clay) Parker.  Wiggins said on July 19, 2000, he was called to the Best Budget Inn.  Ex. J, p. 20 (here referring to the page number in the lower right corner).  He spoke to Mr. and Mrs. Gallaher, an elderly couple, about an attempted

robbery committed against them by a person described as a black male. *Id.* They

went to the area where the incident occurred and Wiggins observed blood. From the

placement of blood spots and the direction in which the assailant ran, Wiggins

determined that the person was bleeding from the left side of his body. *Id.* The hospital

was notified to be on the lookout (BOLO) for a black male with a fresh gunshot wound

somewhere on the left side of his body. *Id.*, pp. 20-21.

Cla Parker called Wiggins later that same day to inform him that a black male

was in the emergency room (ER), receiving treatment for a gunshot wound to his left

hand. *Id.*, p. 22. Parker told Wiggins that the person was Patrick Carson, and since

Parker had dealt with Carson in the past he told Wiggins he thought Carson might be

more at ease talking to him (Parker). *Id.* Wiggins said Carson told Parker he was

raking and burning trash in his mother's back yard when a bullet went off and struck his

hand. *Id.* Carson told Parker he could go to her house and check his story. *Id.*

Wiggins and Parker went to the house of Carson's mother and knocked but no

one answered. *Id.* They walked to the back and observed the pile of trash but could

not find any live rounds or spent casings. *Id.* While there, they observed a bicycle

which Parker said belonged to Carson. *Id.* Wiggins walked over to the bike, which was

leaning against the house, and observed drops of blood on the left bar of the front wheel

and on the left side of the bar leading from the handle bar to the pedal sprocket. *Id.*

Wiggins later interviewed Mrs. Foster, Petitioner's mother, who said she was at work

when the bullet hit him. *Id.*, p. 23. Wiggins said:

> When Det. Parker had interviewed Carson, he asked Carson if he could
> get mouth swabs. Carson told him he could. Ptl. Norris filled out a

F.D.L.E. lab request and I took Carson's mouth swabs, blood samples
[from the scene], the purse, and the red bag to the lab.

*Id.*, pp. 23-24.[5]

In his statement, Cla Parker said that when he reported for duty on July 19, 2000,

he was informed of an attempted armed robbery the night before during which the

suspect apparently shot himself.  *Id.*, p. 25.  Shortly thereafter he was informed that

black male Carson was being treated for a gunshot wound to the left hand.  *Id.*  Parker

had personal knowledge of Carson and of his history of breaking into vehicles at local

motels.  *Id.*  Parker instructed officers at the hospital "to ask Carson to come to the

Police Station for an interview concerning how he suffered a gunshot wound to his

hand," and notified Wiggins that he (Parker) would interview Carson.  *Id.*  While waiting

for Carson to arrive at the station, Parker learned that the victims were still at the motel.

*Id.*  Parker composed a photo line up of six similar black males, including Carson, and

took them to the victims.  *Id.*  Upon showing the photographs to and talking with the

victims, Parker thought "that both victims were so traumatized by the event that a

positive photographic identification was difficult."  *Id.*, p. 26.

Parker then returned to the station where Carson was waiting for him.  *Id.*  Parker

said he advised Carson of his rights and Carson said he understood.  *Id.*  He asked

Carson if he would be willing to explain how he suffered the gunshot wound.  *Id.*

Carson told him that around 7:30 the night before he was burning trash behind his

---

[5] It is unclear precisely what Ptl. stands for, presumably an officer or other
employee of the Perry Police Department.  Mrs. Gallaher's purse had a bullet hole in it,
and her red overnight bag had blood on it.  *Id.*, pp. 21.  Blood samples were taken from
the scene by Ptl. Norris.  *Id.*

mother's house, some old bullets had been dumped in the burning trash, and three or four shots went off, one hitting him. *Id.* "Carson advised writer to go to the house and look at the trash pile if writer doubted his story." He asked Carson to provide DNA samples and Carson agreed to do so. *Id.* Parker said he informed him the DNA would be compared to blood samples taken at the scene, and "Carson willingly provided the samples. After providing the samples Carson left the Police Station to seek additional medical treatment in Tallahassee." *Id.*

Parker and Wiggins went to the Foster residence, and no one answered when they knocked. *Id.* They went to the back and found a trash pile, "burned at some time indeterminable" to Parker. *Id.*, p. 27. They found no live or spent ammunition in the pile. *Id.* They saw a bicycle leaning against the house, and observed small blood drops on the frame. *Id.* Wiggins talked to a neighbor who had not heard any shots around 7 or 8 p.m. the night before. *Id.*

When Petitioner entered his plea on March 1, 2005, the prosecutor set forth a factual basis for the plea. He noted that the gun discharged, striking Defendant in his hand and leaving blood at the scene. "He then left the scene, apparently riding his bicycle back to his house," and blood was observed on the bicycle the next morning. Ex. B, p. 350. The blood was on the side of the bicycle consistent with having dripped from Defendant's injured left hand, and bicycle tracks were seen near a dumpster behind the motel where the shooting occurred. *Id.*, p. 351. It was thought that the assailant left on a bicycle as no vehicle was observed. *Id.*

Video depositions of Wilma and Patrick Gallaher were taken on October 16, 2001. Ex. A, pp. 98-159. Defense counsel at that time, William Williams, noted that no

formal motion had been filed "because when we took the deposition an instance that occurred on 11 September and subsequent to my participation in the Marine Corps Reserves, I've not had the time to put pencil [to] paper to finalize the motion." *Id.*, at 102.  He had discussed with the judge and prosecutor a possible motion to suppress identification testimony by both witnesses.

> Specifically, what it boils down to is that when the investigator showed them a photo pack, according to his testimony the following morning, he testified at deposition he maintained that he destroyed the photo pack because it was obvious to him that neither Mr. or Mrs. Gallaher could pick anybody out.  That it was obvious to him that they were focused on the gun and nothing else, and then they were not able to identify anybody.

> At deposition, Miss. Gallaher maintained that she looked at, I believe she said somewhere in the vicinity of approximately 20 photographs and her testimony at that point is recorded in her deposition.  So, I'm not saying that it was exactly 20, but somewhere around 20.

> And she indicated that she picked out two possibles and pointed them out to the officer, which is not consistent with the testimony he gave in sworn deposition months ago.

> She also indicated that at some point someone had told them that Patrick Carson was, in fact, the person and had made a [statement] to the effect . . . that's probably him because we had dealings with him before.

> The husband, Patrick [Gallaher], testified at deposition that he was not able to pick anybody out of the photo pack.  He testified on the date that we took his deposition, 19 September, well, maybe I could have . . . .

> When asked why he could identify him today, he said because someone had shown him an individual photograph of the person they maintained was the person that robbed them.

> *              *                *

> Basically, my position would be that any identification testimony offered by either Wilma or Patrick Gallaher is tainted by inappropriate actions and comments by law enforcement, by the fact that they were, obviously, not able to identify anyone or give a description on the evening of the attempted robbery other than a Black male with approximate height, weight, nothing else . . . .  That the only reason they could possibly pick

anybody else, anybody out now was because they were inappropriately
shown a picture of my client and told this is the guy, this is the guilty son-
or-a-gun.

*Id.*, pp. 103-104.  He therefore objected "to any identification testimony being solicited or
offered at trial."  *Id.*, p. 105.  See also *Id.*, p. 125 (reasserting objections).

Wilma Gallaher said the man who stepped around the corner had a narrow face
and a brown bandanna around his head.  *Id.*, pp. 125-126.  She said she picked out two
photos the next day she thought might be the assailant, but one had big ears in the
photograph and she could not tell if it was the same person because of the bandanna.
*Id.*, p. 126.  Out of about 20 pictures she identified two, and thought it could be either
one but was not sure.  *Id.*, pp. 129-132.

Patrick Gallaher said he could not give a very accurate description of the person,
as he had a sock or winter hat or bandanna around his forehead.  *Id.*, pp. 147-148.
When he looked at the photos he could not pick one out as a likely suspect, but picked
one that could have been him.  *Id.*  He saw the man's face but there was nothing about
it that would make him recognize it if he saw it again, and said he probably would not
recognize him now.  *Id.*  He told the officer it might be this one or this one, but was not
sure.  *Id.*, p. 151.  He said later an officer showed him and his wife a photo, and said
"this is the guy."  *Id.*  This did not happen the same day as when he first looked at the
photographs.  *Id.*, p. 152.  He said they left town and then came back and spent another
night, then another night; it could have been the day they came back or the next day
that they were they were shown the one photograph.  *Id.*

The sequence of events as evidenced in the record is that an attempted robbery
had occurred at a motel, during which the black male assailant apparently shot himself

somewhere on his left side.  The hospital was notified to be on the lookout for such an injury, and Petitioner arrived at the hospital the next morning seeking treatment for a gunshot wound to his left hand.  Cla Parker knew of the robbery, the BOLO, and Petitioner's injury, and was familiar with Petitioner and his past history of breaking into vehicles at local motels.  According to both officers, Petitioner voluntarily agreed to go to the station to discuss how he was injured, and voluntarily agreed to provide a DNA sample to be compared to blood found on the scene.  Neither officer said they told Petitioner he had been identified; indeed Parker gave his opinion that the victims were too traumatized to make an identification.  Moreover, while there is an indication that they were at some point shown a photograph of Petitioner as the person who did it, this happened a day or more after they looked at the photographic lineup, and after Petitioner had already provided the DNA sample.[6]

Petitioner claims that counsel should have pursued a motion to suppress based on the record, but the *only* indication that Petitioner was falsely told he had been identified prior to agreeing to give a DNA sample is Petitioner's claim raised here and in his Rule 3.850 motion.  Petitioner does not claim that he told counsel that he only agreed to give mouth swabs when officers told him he was identified, or told him he would not be released until he did so.

Moreover, apparently after Petitioner provided the samples, the two officers went (at his suggestion) to his mother's yard, to confirm the story that bullets went off while

_____

[6] Parker said he took the photographs to the motel before Petitioner was brought to the station, and when he returned to the station Petitioner was waiting for him.  The first line up was therefore close in time to the DNA sample taken from Petitioner at the police station.

he was burning trash.  They found no spent bullet casings in the burned trash *and*

observed a bicycle with blood spots on it.  Not only was this unexplained by Petitioner's

version of his injury (which did not involve him riding his bicycle), but it was entirely

consistent with the theory that the assailant, bleeding from his left side, the motel on a

bicycle.  At this point, the officers knew that a black male had committed the offenses.

They knew that Petitioner had made a habit of going to motels and breaking into cars,

and an armed robbery at a motel was sufficiently similar to inquire further as to

Petitioner's culpability.  They knew that the offender had injured himself when his gun

went off, and was bleeding.  Petitioner was injured in the left hand by a bullet wound.

They suspected the offender used a bicycle.  The bicycle they found at Petitioner's

home had blood drips on the left side where Petitioner's hand would have been as he

rode the bicycle.  Petitioner said he was hit by a stray bullet that exploded as he burned

trash, but no shell casings were found at the fire site.  Even if they did not have it

before, this gave officers probable cause to obtain a DNA sample from Petitioner.  A

DNA would ultimately or inevitably have been discovered, because probable cause

certainly existed after (and independent of) allowance of the first sample.  Petitioner still

had saliva from which a second DNA sample could have been obtained, even if the first

sample had been suppressed.  *See* Nix v. Williams, 467 U.S. 431, 441-45, 104 S.Ct.

2501, 2507-09, 81 L.Ed.2d 377 (1984) (discussing the inevitable discovery and

independent source exceptions to the exclusionary rule, the police should not be put in

a *worse* position if there had been no error or violation).

Indeed, the collection of mouth swabs for DNA testing seems no more intrusive

than fingerprinting.  The Supreme Court has "left open the possibility that, 'under

circumscribed procedures,' a court might validly authorize a seizure on less than probable cause when the object is fingerprinting." Kaupp v. Texas, 538 U.S. 626, 630, n. 2, 123 S.Ct. 1843, 1846, n. 2, 155 L.Ed.2d 814 (2003), *quoting* Hayes v. Florida, 470 U.S. 811, 817, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985).  In Hayes the Court found a Fourth Amendment violation where the police lacked probable cause to arrest yet went to the suspect's house and took him, without his consent, to the police station for fingerprinting.  *Id.*, at 813-814, 105 S.Ct. at 1645-4646.  Yet on remand, the Florida court found that the fingerprints were properly admitted.  Hayes v. State, 488 So.2d 77, 81-82 (Fla. 2d DCA), *cert. denied*,  479 U.S. 831 (1986).  The court found a distinction between evidence which can change and evidence – such as fingerprints – "that exists permanently and independent of the fact that a crime has been committed."  *Id.*, p. 79. Fingerprints never change from birth to death.  *Id.*, at 79-80.  Petitioner's DNA does not change either.

An evidentiary hearing is not needed.  Ground one is without merit.

**Grounds Two and Three**

Petitioner asserts that his conviction and sentence for escape violates due process (ground two), and that counsel was ineffective for advising him there was no defense to the escape charge (ground three).  Doc. 1, pp. 10-13.  He argues that Fla. Stat. § 951.24(2)(a) authorizes a court to "extend the limits" of confinement only for *sentenced* prisoners, and since he had not yet been sentenced there was no authority to extend the limits of his confinement to work release.  *Id.*, p. 10.  As his confinement was not lawfully extended, Petitioner argues, he could not be "deemed an escapee" under § 951.24(4) or punished under § 944.40.  *Id.*, p. 11.  Had he been properly

advised of this by counsel, Petitioner claims he would not have waived his right to trial

on this charge.  *Id.*, p. 12.

The trial court found no due process violation.  Ex. J, pp. 4-5.  The court noted

that Petitioner pleaded guilty to escape under § 944.40, providing that:

> Any prisoner confined in any prison, jail, private correctional facility, road
> camp, or other penal institution, whether operated by the state, a county,
> or a municipality, or operated under a contract with the state, a county, or
> a municipality, working upon the public roads, or being transported to or
> from a place of confinement who escapes or attempts to escape from
> such confinement commits a felony of the second degree . . . .  The
> punishment of imprisonment imposed under this section shall run
> consecutive to any former sentence imposed upon any prisoner.

*Id.,* p. 5 (quoting the statute).

The court noted that for escape, "the essential element for a prisoner in work

release is the failure to return from extended confinement."  *Id.*, *citing* Price v. State,

333 So.2d 84 (Fla. 1st DCA 1976) and Early v. State, 678 So.2d 901 (Fla. 5th DCA

1996).[7]  Petitioner had requested placement on work release and acknowledged he had

to have prior approval to go anywhere other than his approved employment, yet he

failed to return to the jail and "remained at large for over a month until he was arrested

---

[7] *See also* Spann v. State, 996 So.2d 873, 874 (4th DCA 2008) (finding sufficient
custody for escape where Spann told he was under arrest and pushed officer away who
was about to handcuff him).

> Section 944.40, Florida Statutes, defines the crime of escape as
> committed when "[a]ny prisoner ... being transported to or from a place of
> confinement ... escapes or attempts to escape from such confinement." "
> 'Prisoner' means any person who is under ... criminal arrest and in the
> lawful custody of any law enforcement official." § 944.02(6), Fla. Stat.  Our
> supreme court has held that "'transportation to a place of confinement'
> begins at the time the suspect is placed under arrest."

*Id.* (citation omitted).

on unrelated charges in Hillsborough County nearly 200 miles away." *Id.* The court found that, "regardless how the Defendant came to be placed on work-release he was properly designated as an escapee when he failed to return," so there was no due process violation. *Id.* The related ineffectiveness claim was consequently deemed without merit, as counsel was not ineffective for failing to raise a meritless claim. *Id.*, pp. 5-6.

While Petitioner has couched his claim as a violation of due process, it is a matter of interpretation whether in his particular (and undisputed) circumstances of absenting himself from supervision he could be guilty of escape under Florida law. This is a state law claim not cognizable in habeas corpus. *See* Branan v. Booth, 861 F.2d 1508 (11th Cir. 1989) ("a habeas petition grounded on issues of state law provides no basis for habeas relief," even if "couched in terms of equal protection and due process.") (citation omitted); Johnson v. Rosemeyer, 117 F.3d 104, 110 (3rd Cir.1997) ("[e]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause."). As "state courts are the final arbiters of state law," and the trial court determined this claim would have been unsuccessful if made by counsel, Petitioner cannot show ineffective assistance of counsel. Herring v. Secretary, Dept. of Corrections, 397 F.3d 1338, 1354-55 (11th Cir.), *cert. denied*, 546 U.S. 928 (2005).[8]

Finally, even aside from the lack of merit to the claimed defense, the argument that Petitioner would not have entered a plea had he known of the defense is

---

[8] In Herring, the Florida Supreme Court had held the objection (which counsel was faulted for failing to raise) would have been overruled, so the Eleventh Circuit found that petitioner could not establish deficient performance or prejudice. *Id.*, at 1355 (footnote omitted).

disingenuous.  Petitioner was aware of it, having obviously discussed it with counsel shortly before he entered his plea as a basis for Judge Bean to recuse himself.  *See* Ex. B, pp. 291-292 (hearing of February 28, 2005).[9]  Recusal was granted, and the very next day (March 1, 2005), Petitioner entered his plea before Judge Davis.  *Id.*, pp. 294, 297-362.

Therefore, Petitioner has not shown that the state court's adjudication of the merits of this federal claim has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Conclusion**

Accordingly, it is **RECOMMENDED** that 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Petitioner Carson, challenging the judgment and twenty year sentence imposed by the Circuit Court of the Third Judicial Circuit, in and for Taylor County, Florida, case number 2000-263-CF, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on March 12, 2009.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

---

[9] Counsel argued that recusal was appropriate, *inter alia*, because "a defense in my client's opinion may involve the court authorizing and being someone that gave my client permission to be on work release, and Petitioner thought it was in his best interest "because the defense that may arise in this particular case may involve that court decision and the court's action in allowing him to be on work release."  *Id.*

## <u>NOTICE TO THE PARTIES</u>

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.